Good morning. May it please the Court. Gary Ehrman on behalf of Petitioner, Mr. Tang. This morning we are arguing that the Board erred in determining that the Petitioner, a practicing Catholic here in the United States, had not met his burden of proof. An applicant need only show to a reasonable degree that he or she will be persecuted if removed to his country of origin. The Supreme Court has underscored the standards leniency, noting that even a 1 in 10 chance of suffering persecution would make an applicant's fear well-founded. This Court has stated, a fear of persecution is objectively reasonable where a reasonable person in the applicant's circumstances would fear future persecution if removed to his native country. And lastly, the reasonable person standard has been described as an objective test indicating that an applicant's fear of persecution has some basis in reality validated by specific concrete facts. That's Mogharabi BIA. Your Honors, the Respondent in this case, the Petitioner in this case, was found credible, found to be a credible practicing Catholic for the past four years before appearing in front of an immigration judge. Four years? Four years. He converted to Catholicism 2011. In this country? Correct. After he came here from China? That's right. He was, he was, a friend of his, a co-worker, excuse me, apostolatized to him, introduced him to the church, and he continued to go to church for four years. And the judge found him to be a credible practicing Catholic. The country reports, the international freedom, international religious freedom reports, clearly state that there is a reasonable possibility of persecution against Catholics. Why? Because the Chinese government does not recognize the Holy City, the Vatican, as the authority to Catholics. Is that a verbatim quote from the report, or is that your summary? I thought the report said there was a wide disparity in China of how there is a reaction to the Catholic Church. The Department of State International Religious Freedom Report from 2012 at page three. Are you in the appendix? At page three. The report goes on to say that the Holy See has no diplomatic relations with the Chinese government and that the Chinese Patriotic Association does not recognize the Holy See's authority to appoint bishops. So you're reading from the BIA? I'm reading from the BIA decision. Where's the report? Okay. I have that here. The report... The report stated, and I quote, Catholics profess... Tell us where you are in the appendix. Well, right now I'm referring to page nine of my brief. Well, what about the report? Do you know where that is in this... I'll find it and on my time... The real evidence. That's what we want to see. Well, the real... I'm quoting from the report. I'm sorry if it doesn't... I understand. What it says is, Catholics professing loyalty to the Vatican are not permitted to register as legal entities. Apostatizing in public or unregistered places of worship is not permitted. So you have a religion that is supported by the Vatican that is led by the Pope. Well, you want us to say that every Catholic from China that's in the United States is entitled to asylum. I don't want to go down that road, Your Honor, if I may. Well, that's what... I don't know what you're... I represent Mr. Tang. This is not a precedent-setting case. This is a case of an individual who's a practicing Catholic who has a reasonable fear of persecution. If we go down that road, it could influence how decisions are made because there's a fear of an influx of millions of people. If that was going to happen, it would have happened. We have to take this case on a case-by-case basis and ask ourselves, this person, does he have a reasonable possibility of being persecuted based upon his practice of religion? And the answer is yes, a reasonable possibility based upon a reasonable person's belief. His Chinese government does not recognize his religion, simply put. But as I understand these cases, your client would have to have shown either that he would be singled out for persecution... Correct. ...or that there is a pattern or practice of persecution against people similarly situated to him. That's exactly correct, Your Honor. So I didn't remember seeing in your brief an argument that he would be singled out for persecution because nobody in China knows who he is. So you have to show it. You tell me if that's wrong. So you would therefore have to show the record would have to reflect a pattern of persecution. Your Honor, we have two arguments. It's that he would be singled out and that it's a record of pattern of practice of persecution. He would be singled out. Okay. He's stated and found to be credible on the record that he would not attend a government-sanctioned Catholic church. He said that he wouldn't because his priest down at Williamsburg told him that was not the legitimate church. Correct. And that's supported by the record. He said that. So what that proves is that the priest at Williamsburg says that the Catholic church in China, that the one that the government recognizes is not the legitimate Catholic church. Right. That proves that that priest down at Williamsburg believes that. Right. But that priest at Williamsburg doesn't make the law with respect to immigration processes. Correct. And it doesn't create the principles on which the BIA or the immigration authorities have to conduct themselves in the context that I know of, that we don't defer to a priest in Williamsburg. That's correct. Which is what you say we should do because your client's found credible and he's credible on the proposition. That's what he said. He absolutely said that. And we'll credit that, that the priest down there said that. And we can go further and say and agree that the priest down there understood that, that that priest doesn't bind us. No. And the priest was just a lay witness, was not an expert on the conditions, country conditions in China. The priest was there basically to corroborate that Mr. Tang was an actual practicing Catholic. And I thought this country report dealt with the clergy more than it did the lay persons. In your mind, your man's a layman. He's not a member of the Catholic clergy. Initially it did, but the country reports have now shown that lay people are also persecuted. To respond to your question, Your Honor, my client testified that he would not attend a government-sanctioned church, that he would attend an underground church, and that he would proselytize to family and friends in China. So the argument, hence, is it is reasonably likely that sometime in his life, in the next 10, 20, 30 years, maybe not the first month, that by attending an unauthorized gathering or by proselytizing, one of the millions of spies that the Chinese government network has, or their surveillance cameras that they're putting on every corner, will bring his religious practice to the attention. Is all that in the record, or are you just making that up? No, it's just based upon the 15 years of practice. You're just making that up. So it's based upon New York Times articles, Your Honor. So the argument is, yes, he will be singled out because of these activities of going to church on a regular basis. At some point in time, is it reasonable? It is. And their argument is also that there is a pattern of practice. Don't you have to have proof on that first prong, though, in terms of somebody being singled out, that there's some awareness of the, in this case, the Chinese government, of who this man is? That's where the board of the BIA erred, and when it stated that the respondent did not establish that the Chinese authorities are or could be aware of his practice of Catholicism in the United States. Where are you in page 2? I'm reading the BIA decision. Page 3? Page 3, Your Honor, paragraph 2. The full paragraph? I'm reading starting line 1, 2, 3, 4, 5, 6. The respondent did not establish Chinese authorities or could become aware of his practice of Catholicism in the United States. That's the incorrect standard. It's could they become aware of his practices of Catholicism if he's sent back to China. It doesn't matter whether they know now. It's will his activities of going to underground churches be discovered by the Chinese government, and that's what we're asking the court. Well, it seems like that brings you back to the question Judge King asked at the beginning. How do you differentiate between your client and any other person who immigrates here from China who happens to be a practicing Catholic loyal to the Vatican? How would you ever differentiate between your client and all those people? I don't think you can. I think the law is clear. If somebody, no matter who they are, no matter if it's the first person or the millionth person, enters this country and has a valid claim of religious persecution or fear of religious persecution, then the law requires that they be granted asylum. And until those laws change, that is the way the courts must view this. And we cannot fear an abundance of religious practitioners coming to this country. It's not fair. Counsel? Yes. If I can ask the question. Sure. Is it fair to say your position is that as to Chinese Catholics, a decision in favor of your client is a decision in favor of all present here or to come hereafter? Well, I think a decision in favor of my client, precedent or unprecedented, would establish that if one can prove that they are a legitimate, practicing, sincere Catholic or Christian from a country that persecutes Catholics or Christians, then they do have a right to asylum. But they must prove through their own testimony, through corroborating witnesses such as the pastor and priest, that they are sincere and practicing practitioners. And that's up to the immigration judge on their level to determine the sincerity of these claims. So with that said. The question is whether individually they're sincere enough, which would open the door to asylum here by 6 million Chinese Catholics. I think the country report says there are about 6 million. The 6 million are the ones who are going to the authorized churches. 6 million is 0.4 percent of the Chinese population. So there's more than that. 6 million going to the authorized churches. How many are going to the underground churches? Unknown. I don't know. The 6 million plus are all entitled to asylum. No. It's what you want us to rule. No, because those 6 million are satisfied with the government church. They're satisfied with that church. It's those who are going to underground churches. Does the Executive Branch get any discretion here at all? Deference, I mean. Deference. They've got to develop these policies and deal with it every day. Can we give them any deference? There's not a quota as far as asylum refugees. Right. So there isn't any executive deference. It would have to go to the legislature. Right. But the way the IJA applied this thing and the way the BIA applied it, is that consistent with their precedent? No. It's not consistent with their precedent. No. They didn't even follow their own timeline. They didn't follow the reasonable possibility standard under Moghrabi. I reserve time. Thank you, counsel. Ms. Ciarmon. Ms. Crockett, I'm sorry. Ms. Crockett. Thank you, Your Honor. May it please the Court, Sarah Crockett for the Attorney General. The Court should deny this petition for review because no record evidence compels the conclusion that Roman Catholic practitioners at underground churches are subjected to a pattern or practice of persecution in China. The agency reasonably determined here that the petitioner failed to establish his fear was objectively reasonable. It's not in dispute whether this particular applicant was credible or was subjectively genuine in his belief, based on statements from others in the United States after he converted. The agency acknowledged that they believed and credited his testimony and that he was a believable witness. However. Your opposing counsel says he also qualifies under the alternative test, that he would be singled out for persecution. Your Honor, the objective reasonableness of someone's claim must be proven, even though within the asylum context there is, as opposing counsel mentioned, a somewhat permissive standard where perhaps a 1 in 10 chance might be sufficient. What's important to focus on in this case is that an applicant must demonstrate either that they would be singled out or that there is a pattern or practice of persecution against people like them, people similarly situated. Here, the government's position is, in fact, that opposing counsel did not exhaust an argument about individual targeting. To the best of the government's understanding of his brief and also of the petitioner's brief before the board, there are no claims that he will be individually targeted. Even if it's possible or if the Court views it this way, that the petitioner attempted to exhaust such an argument that he would be individually targeted, the government, while not conceding that that exhaustion occurred, would also say that on the merits there's simply little to no evidence in this record that this petitioner would be individually targeted. In the Jang case, this Court recognized at page 31 of that case that a petitioner who — Is that the Sixth Circuit case? Your Honor, I believe that's a Fourth Circuit case, but I can tell you that. Okay. I'm sorry. Go ahead. Sorry. Thank you. The Jang case recognized that there was a petitioner who reasonably believed, in his own mind, subjectively, had a fear, perhaps, that police might target him. But the Court, this Court, recognized that without any firsthand knowledge, there's simply no basis for the Court or the agency to conclude that that person had demonstrated individual targeting would occur in his case. So it is the government's position that that argument was, in fact, not exhausted before the agency, and thus the agency reasonably concluded that there was no individual targeting. With regard to pattern and practice, as I mentioned earlier, that is a very high standard to meet. In fact, there are only a couple of cases where circuits around the country have recognized that such a standard was met. And in the Chen case, in this Court, the key for the applicant is to show the thorough What do you say the standard is there? The standard for demonstrating whether there is a pattern of practice. This Court has recognized in Chen that the key for the applicant there, Your Honor, is to show the, quote, thorough or systematic nature of the persecution he fears. And I think that's the key to this case. The government and the agency made a thorough attempt to review all the documentation produced in this case, including, but not limited to, the 2012 International Religious Freedom Report. That report does not show that there is a thorough or systemic amount of mistreatment levied towards Roman Catholic practitioners at underground churches. Without such a showing, this petitioner cannot prevail under any circumstances. It's a high burden. The Ninth Circuit and the Seventh Circuit, as this Court summarized in Chen, have recognized at one time that a pattern of practice might exist. One example that was given was Is there a pattern of practice with respect to the clergy? With respect to the clergy in China.  Is that your question, Your Honor? Catholic clergy in China. I don't think that we have agency guidance on that question, so I would be speculating. But in that Sixth Circuit case, they sent that back and said that you all failed to explain the distinction between leaders and laymen. Right? They sent it back. Your Honor. Zhang versus Holder. 2012. Yes, Your Honor. I believe that was the idea. Is that exactly what happened here? In that case. The reason that the government's position is that that did not happen in this case is that those facts are not presented. In the government's brief, there's a lengthy section that I would be happy to go through in some detail where the opposing counsel's claims about details in the documents that allegedly support compelling a conclusion different from what the agency made here, they simply do not support those contentions. I'm sorry, Your Honor. Excuse me. I hate to do this. I'm sorry. Sure. That's fine. Madam Clerk, her light is not on. She has no lights. There are no lights showing as of time. Indicate. Apologize. I'm sorry. Can you restart? Yes, sir. I got it. When you reset, is that? I'll set some time. Okay. Time elapsed. Okay. I'm sorry. Thank you, Your Honor. Sorry about that. So, Your Honor, you mentioned how priests and religious leaders are treated in China. I think it's pretty clear from the report that at times some religious leaders have been mistreated. But he's not a religious leader. That's correct, Your Honor. He's never alleged that he's a religious leader. In fact, he testified. Your position is that laymen are different than religious leaders? Absolutely, Your Honor. But did you explain that? Did the BIA explain that in its decision? I think that the BIA does explain that by emphasizing exactly what group the petitioner testified he is in and what group the agency believes he is in as a result of that testimony and other evidence, which is laypeople. I can quote the decision itself. The board held on page three of the record, quote, the country conditions reports do not show that there is a pattern or practice of persecution in China. Now, where are you? I'm sorry, Your Honor. That's on the board's decision, the second page, but it's page three of the record. And the last paragraph? Yes, Your Honor. Your page three? That's correct. That last large paragraph there, in the middle of it, the agency, and this is the board, acknowledged that he is an ordinary lay practitioner who attends underground churches. And the agency, having thoroughly and carefully reviewed the report, found no evidence that there is a pattern or practice of persecution against such a group and that, in fact, the report on, if Your Honor was looking earlier for that report, it's centered around pages 204 to 209 of the record in this case. On page 204, that report acknowledges that in parts of the country, local authorities, quote, tacitly approved of or did not interfere with the agencies of unregistered groups. So we have in this case a petitioner who testified on the record. He is interested in practicing in unregistered churches. We also have the report which states not only are there many Catholics who practice in the sanctioned church, but there are also Catholics who practice in underground churches. There are some allegations of mistreatment of people who practice various religions. I would be happy to go through some of those details. Is there a differentiation in the country report for China between practitioners of other faiths as opposed to Catholics? The government's position on that, Your Honor, is that many of the allegations. Well, what does the country report say? The country report states that in China there are certain types of mistreatment against unspecified religious groups and there are broad characterizations of possible human rights violations against religious groups, but it does not specify very many allegations at all against Roman Catholic practitioners in underground churches. In fact, for example, despite the contentions to the contrary in the petitioner's brief, there's a section of that brief on page 13 addressed on my brief, page 14, where there's unregistered groups that face scrutiny and mistreatment. But as the government explained in its brief, this focuses. Are those unregistered Catholics or some other religious group? Those ones are, in fact, Falun Gong, Uyghur Muslims, and Tibetan Buddhists. Another example would be on several pages in the record, the report discusses mistreatment of Catholics, but those pertain to state-sanctioned churches. Examples include one on page 197, 199, 201, and 207 of the record. And so ultimately, Your Honor, I don't think that the report details allegations to any kind of consistent degree of mistreatment, much less persecution, of people who attend underground churches who are Roman Catholics. And that is the specific group that the petitioner has stated he is a member of, and that is the specific evidence he needs to produce in order to demonstrate of this high burden of pattern of practice. I would also like to add that the issue of whether being forced to practice your religion in secret or not at all, whether that rises to the level of persecution, it's the government's position that that issue, while perhaps raised in the petitioner's brief, was not exhausted before the agency. The agency did not have any opportunity to make a determination of whether such a situation might rise to the level of persecution. There are some courts, the Seventh Circuit and the Ninth, that have dealt with that issue in more detail. However, it's unnecessary for this court to reach for two reasons. And just before I explain those two reasons, I alluded to it briefly, but I do want to say we have an independently dispositive finding regarding his lack of well-founded fear of future harm, and so it's unnecessary to reach this issue regardless. So the two reasons why this issue of whether it rises to the level of persecution to prevent someone from practicing or not, that's not before the court, this issue. This first one is the petitioner raised no challenge. There was no opportunity for the agency to evaluate that. There was no evidence produced about past persecution or a well-founded fear of persecution on the basis of I won't be allowed to practice my religion. There is testimony that the petitioner feared arrest, which is kind of a classic. Arrest in detention, you know, being attacked in detention, that's kind of a classic example of persecution. But the petitioner didn't articulate his claim as I fear I'll never be able to practice my religion. Instead, he voluntarily stated that he wanted to practice religion in an underground church, that the country conditions report state is an available option to him. The second reason is that he simply wouldn't be forced to practice his religion in secret. Again, he has stated that he wants to practice in an underground church, and there are at least some other people, Your Honor, I'm not sure how many are practicing in underground churches, but the record suggests there are certainly some people doing that, and that, in fact, in certain areas, it's permitted and overlooked, as I mentioned earlier. Finally, the petitioner produced another country report after the agency had already reached an administratively final decision in his case through the 28-J letter that is in the record, and in the government's response, the government explained that that document is not admissible in these proceedings for statutory reasons, a statutory authority, and that this court has recognized in the Lendo case that evidence produced after that time that's not within the administrative record at the time of the order of removal should not be considered at this stage. And, again, in Lendo, the court recognized the only remedy, if you want additional information to be considered, is to file a motion to reopen back with the agency for them to consider. If we considered it, would it change the result? Your Honor, I don't have the benefit of agency expertise on that question. But I can say sometimes there will be new reports with the word torture in them or another seemingly significant word. I wouldn't say that that would be irrelevant to the conclusion, but there's certainly nothing in that report that would require the agency to change its decision or that would compel an alternative conclusion. But what's important here – So you're saying it doesn't make any difference anyway? What's important here, I think, Your Honor, is that while it might be important for the agency to consider, it certainly does not appear that it would compel an alternative conclusion that the agency didn't reach in this case. And even if it were just positive, it wouldn't be possible for the agency to have considered it at the time. And there's statutory authority that prevents the court from considering it now. And so it would need to go back to the agency for them to consider whether it would really make that difference. So, Ms. Crockett, you basically would say Mr. Tank cannot prevail in this petition because there's insufficient evidence in the record to show that a Catholic who wants to practice in an underground church would be persecuted? Insufficient evidence to show that he, Mr. Applicant, would be targeted himself, that police are looking for him, or that all people like him would be targeted because that's the other kind of prong he has available to him, the pattern of practice. Yes, Your Honor. But there's certainly evidence that in China, persons who practice religion as a whole, it's not a very comfortable situation. Is that right? I think that's fair, Your Honor. I think the agency acknowledged the unfortunate situation in China regarding people being able to practice their religion freely. Certainly in the context of our robust First Amendment framework here in the United States, it might not seem like an ideal situation there to us. However, Congress has set forth a strict standard, and the agency has propagated regulations that have not been challenged in this case that apply, that state that the standard is rather high. It is either that you must show the police essentially know about you or you are otherwise going to be targeted by the police or someone that they are willing to let hurt you, or that the government is targeting an entire group that you're a member of, and that is not demonstrated in this record. The problem I had in terms of some of the reasons that may help me with it, it seemed like at some point they were saying that the state-sanctioned Catholic Church was enough, was sufficient, and he couldn't show that he couldn't practice his religion. Is the decision based in part on that? I think you're correct, Your Honor, when you identify, if I'm not mistaken, the immigration judge's decision. It seemed to focus heavily on the assumption the immigration judge appears to have made, which is that perhaps this petitioner will practice in a state-sanctioned church. And that is not actually the focus of the government's defense of this decision by the agency because the board issued its entirely sufficient alternative ruling that it's not so much that he will practice in the church where 6 million people practice, but that he has said he will practice in an underground church. And because he's going to be a layperson in an underground church and because the records do not show that such people are subjected to a pattern of practice of persecution, that is the focus of the board's decision. The board is permitted to issue alternative reasons, and I think that would be the focus of the government's defense. Because you agree that that's flawed in that sense. Would you agree with that? I agree, Your Honor, that the focus of this decision and its defensibility should be on the board's decision and the additional reasons provided where the agency has accepted the petitioner's testimony that he will be an underground church practitioner and that it's not the focus. And that's not the Attorney General's position as to the reasoning of the immigration judge's decision? I would say not at this time, Your Honor. If there are no further questions, the government would ask that the petitioner be denied. Thank you. Thank you, Ms. Crockett. Mr. Yearman, you have some time reserved. Thank you. This morning I've heard this Court talk a lot about reasonableness in my case, the case before us. What's reasonable? Asking us to search within, I think. And so I ask this Court, does anyone on this panel doubt the Chinese government's authoritative rule, their desire to maintain a one-party communist system where there is no threat to that rule? Religion is a threat to communism. It's a threat to the Communist Party. Let me follow up on an argument that your opposing counsel made with respect to proving one prong of the objective test. She says that you waived the argument that the applicant would be singled out for persecution as opposed to establishing a pattern or practice of persecution. Do you agree that your argument was waived? And if not, could you tell us why not? Well, I would respectfully disagree and say that the argument was raised when the petitioner stated that he would continue practicing his religion by attending unauthorized gatherings, unauthorized churches. Tell us, though, where you argued this to the board or to the immigration judge. Page 8 of my brief, we argue that the paragraph 2, both the board and the IJ ignore petitioner's assertion that the Catholic churches registered in China are not authentic, and that petitioner explained that a registered church in China is a government church, and the authentic Roman Catholic church is the underground church, stating basically that because of his disapproval with the government church, he would attend unauthorized churches and therefore could be singled out as a result. The government wants you to believe that it's okay. Go back to China. You could practice your religion. Nobody's going to be the Chinese government is not concerned with that. It's simply inaccurate. As I was stating, the Chinese government is threatened by the rise of religion. It's a threat to their rule. The court, Judge King, you asked what would happen if you looked at the latest country reports. Well, you would see that there's a continuous uptick in religious persecution because religion is slowly spreading throughout China, and as it spreads, it will be suppressed, the same way the Chinese government has for 40 years suppressed Tibetans from worshiping their own Dalai Lama, just like they want to choose the Dalai Lama for the Tibetans. They want to choose the leader, the pope, for the Catholic Church. That's not freedom of religion. That does not allow an individual to practice his religion freely. So we ask this court to consider the Chinese government authoritarian rule and desire to remain in power and crush anything that threatens that when considering does this young man, who's found to be a credible practicing Catholic, have a reasonable possibility of being singled out in the next 30, 40 years of his lifetime. Thank you. Thank you, counsel. We'll come down to brief counsel and proceed to our last case.
judges: Roger L. Gregory, Robert B. King, G. Steven Agee